```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW MEXICO
 2
 3    JERICHO NAGURSKI,
 4              Plaintiff,           NO. CIV-10-581 JAP/WDS
 5    v.
 6    CITY OF ALBUQUERQUE,
      JAMES BURTON, in his individual
 7    capacity, and GUSTAVO A. GOMEZ,
      in his individual capacity,
 8
                Defendants.
 9
10
11
12
                   DEPOSITION OF JAMES BURTON
13
14
                       February 1, 2011
15                        9:10 a.m.
                     201 12th Street, N.W.
16                Albuquerque, New Mexico  87102
17
18
          PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,
19    this deposition was:
20
21    TAKEN BY:   KARI T. MORRISSEY
                  ATTORNEY FOR PLAINTIFF
22
23
      REPORTED BY:  Jacqueline R. Lujan, CCR #91
24                  Paul Baca Professional Court Reporters
                    500 Fourth Street, N.W., Suite 105
25                  Albuquerque, NM  87103   505-843-9241
```

DEFENDANT'S EXHIBIT A

| | Page 6 | | Page 8 |
|---|---|---|---|
| 1 | A. I worked at a few different shops over the | 1 | Q. Do you know per NHTSA what "standardized" |
| 2 | course of about two, three years. | 2 | means? |
| 3 | Q. Okay. Now, tell me a little bit about your | 3 | A. Exact definition? |
| 4 | training and experience with regard to DWI investigations | 4 | Q. Right. |
| 5 | that you received in the police academy. | 5 | A. I understand what the standardized tests are. |
| 6 | A. We were certified -- we have to -- let's see. | 6 | Off the top of my head, no, I could not reply what the |
| 7 | We go through multiple courses. I couldn't tell you off | 7 | exact definition is. |
| 8 | the top of my head for the academy how many actual credit | 8 | Q. When I said, "per NHTSA," are these |
| 9 | hours we're required to take for the state certification | 9 | standardized field sobriety tests that were created by |
| 10 | board. | 10 | NHTSA, the National Highway Traffic Safety |
| 11 | Q. For DWI? | 11 | Administration? |
| 12 | A. For DWI. I can't tell you off the top of my | 12 | A. They're the ones that they decided to use, |
| 13 | head. But I know that I've done both written -- I've | 13 | yes. |
| 14 | done a wet lab. I've done a practical. I've done | 14 | Q. Okay. The alternative tests, tell me what |
| 15 | in-field trainings. I've done ride-alongs where I had to | 15 | kind of alternative field sobriety tests you've been |
| 16 | watch officers do it. I had to do in-field training | 16 | trained in. |
| 17 | where I was on a ride-along basis. Where I was doing them | 17 | A. I've been trained in both question and answer |
| 18 | with an officer watching over my shoulder. | 18 | and alphabet-type tests, countdown test, finger-count |
| 19 | Q. Are those the same requirements for every | 19 | test. But typically, the two that I'm most trained on is |
| 20 | cadet from the academy? | 20 | the count test, the counting -- countdown test and the |
| 21 | A. Yes. | 21 | alphabet test. |
| 22 | Q. Okay. Now, when you described -- you said | 22 | Q. Now, when you were trained on the standardized |
| 23 | something called a wet lab. Would you describe that for | 23 | field sobriety tests, were you trained -- I mean were you |
| 24 | me? | 24 | given a manual that talked about DWI investigations and |
| 25 | A. Wet lab, we have -- you have citizens or | 25 | these tests and what these tests mean? |

| | Page 7 | | Page 9 |
|---|---|---|---|
| 1 | people -- I don't know if they're volunteers. They have | 1 | A. Yes. |
| 2 | different levels of alcohol given to them. Then we go | 2 | Q. And is that called a NHTSA manual? |
| 3 | through a testing period where we apply the standard | 3 | A. In the academy? Can you clarify -- |
| 4 | field sobriety tests, make estimations on what we think | 4 | Q. Right. |
| 5 | their levels are, and also -- it's just supposed to give | 5 | A. -- what you're asking? |
| 6 | us hands on on how to perform the tests, as well as to | 6 | Q. Do you receive, as a part of your training, |
| 7 | see examples of what typical tests -- or the signs that | 7 | something called a NHTSA manual, that tells you how to |
| 8 | we're looking for for the test. | 8 | conduct field sobriety tests and DWI investigations? |
| 9 | Q. With regard to your training in field sobriety | 9 | A. They didn't give us it in manual form. We |
| 10 | tests, can you summarize for me what tests you've been | 10 | were advised in the academy -- I received, basically, |
| 11 | trained on? | 11 | like stacks and stacks of documentation. We were told |
| 12 | A. Yes. We - -the main ones that we go for is | 12 | that it was based on the whole NHTSA. But as far as a |
| 13 | the horizontal gaze nystagmus, the one-leg stand, and the | 13 | standardized manual, like a physical manual, I never |
| 14 | walk-and-turn test. | 14 | received a physical manual that said this is NHTSA. |
| 15 | Q. Have you been trained in any type of | 15 | Q. But you had stacks and stacks of documents? |
| 16 | alternative tests? | 16 | A. Right. Which we were trained upon, saying |
| 17 | A. Yes. But as far as the standard field | 17 | that this was based upon the standards that NHTSA |
| 18 | sobriety tests, those are -- yes. | 18 | established. |
| 19 | Q. When you say, "standard field sobriety tests," | 19 | MS. MORRISSEY: Was there an objection in |
| 20 | what do you mean by the word, "standard"? | 20 | the Request for Production to those, or are we still |
| 21 | A. We're given just the standardized -- more the | 21 | waiting for the training materials? Oh, no. I'm sorry. |
| 22 | standardized tests. So they've given us a list of tests | 22 | We only asked for the -- |
| 23 | as, again, a standard for us to apply, again, so that | 23 | MR. LEWIS: Right |
| 24 | we're not all doing multiple, different tests in the | 24 | MS. MORRISSEY: Okay. |
| 25 | field. | 25 | Q. (By Ms. Morrissey) So pursuant to your |

1 instructions every time?
2  A. Yes.
3  Q. **Can you recite to me what those instructions**
4 **would be? If you'd pretend that I'm the driver, okay,**
5 **tell me what you would tell me with regard to the one**
6 **leg-stand.**
7  A. Okay. I tell them, "Sir, I'm going to have
8 you stand right here. Put your feet together with your
9 arms at your sides. I need you to stay in this position
10 until I tell you to move. Do you understand?" They
11 usually say yes or no, depending on which, I'll either
12 repeat or continue on.
13     If they say yes, I say, "What I'm going to
14 have you do in a second here is I'm going to have you
15 lift one of your feet. It doesn't matter which. You're
16 going to lift your foot approximately six inches off the
17 ground with your toe pointing forward, foot level with
18 the ground. You'll keep your hands at your sides, your
19 leg up like that. This will be a 30-second test. I need
20 you to count out loud, 1,001, 1,002, 1,003, continuing
21 like that until I tell you to stop. This will be a
22 30-second test. Do not stop until I tell you to do so.
23 Do you understand?" They yes or no, in which case I
24 either repeat it or have them go head. And I'll say, "Go
25 ahead and start when you're ready."

1  Q. **Okay. And what are the suggestions that you**
2 **give on the walk and turn?**
3  A. The walk and turn, again, similar. I'll tell
4 them, "I'm going to have you stand" -- I'll designate a
5 point right here. Typically, I try to find someplace
6 that has like a physical line or some way they can -- if
7 I don't have a physical line, I tell them, "Imagine that
8 you have a straight line in front of you. I'm going to
9 have you put your left foot here on this line, put your
10 right foot heel to toe right in front of it, put your
11 hands at your side. I need you to stand in this
12 position. Do not move from this position until I tell
13 you to do so. Do you understand?" They say yes or no.
14     Then I'll say, "When I tell you to do so, what
15 you're going to do is you're going to take nine steps
16 forward just like this," and at the same time I'll be
17 demonstrating, "take nine steps forward, touching your
18 heal to your toe, walking in a straight line, leaving
19 your hands at your side. Do not lift your arms. You'll
20 walk just like this, counting out loud, looking at the
21 tip of your toe, 1,001, 1,002, 1,003.
22     "You'll continue all the way until you reach
23 nine. When you get to nine, you'll be in this position."
24 I'll again demonstrate the position that I'm in. "You're
25 going to take small, choppy steps to your left-hand side,

1 turning around, and you'll be back in this position,"
2 again showing them the position they'll be in.
3     "You'll then take nine steps forward, counting
4 out loud, just like you did the first time, 1,001, 1,002,
5 1,003, all the way until you reach nine. Do you
6 understand?" They say yes or no.
7  Q. **Okay. Why don't you go ahead and tell me the**
8 **instructions that you give on the horizontal gaze**
9 **nystagmus test?**
10  A. Okay. Horizontal gaze nystagmus, I'll have
11 the individual pretty much in the same position as every
12 other test. I'll ask them to stand there, putting their
13 feet together, their hands against their side. I'll ask
14 them to stay in this position, not to move from this
15 position.
16     I'll then -- I just use my finger with a
17 flashlight on my finger. I'll say, "I need you to look
18 at the tip of my finger. Do not move your head. You're
19 only going to be using your eyes. What I need you to do
20 is just follow the tip of my finger with your eyes the
21 entire time I move it. Again, do not move your head, do
22 not look past my finger." And then I'll proceed with the
23 test, stopping, depending on the individual.
24  Q. **Okay. And when you're attempting to determine**
25 **whether or not a driver is impaired, are there things**

1 **other than the actual nystagmus eye movement that might**
2 **be relevant on the horizontal gaze nystagmus?**
3  A. Would you clarify? Sorry. I don't know what
4 you're asking.
5  Q. **Would you be looking for someone who is**
6 **swaying during that test? Would that be something that**
7 **might be relevant to you?**
8  A. Horizontal gaze nystagmus, not so much, no.
9 I'm just watching for the eye movements.
10  Q. **If someone had difficulty following your**
11 **instructions and they kept moving their head, would that**
12 **be something that you might make a note of?**
13  A. Yes.
14  Q. **Anything else along those lines that seems to**
15 **be some sort of maybe a more common failure to follow**
16 **directions?**
17  A. Again, it's just following directions. I
18 explain the directions to them. Failure to follow the
19 directions, that's in and of itself, kind of failing the
20 test. Because if you're not able to perform the test
21 properly, the same thing you're looking at on this, if
22 you can't follow the directions or perform the test
23 properly, that's what you're looking for.
24  Q. **Let me ask you, from the time that you**
25 **graduated in December 2006, through July of 2009, can you**

Page 18

1 estimate for me how many DWI investigations you
2 completed?
3    A.  I average -- let's see. I mean I average --
4 on a slow month, I would say I still get about three to
5 four DWIs a month, 12 months. I'll just do a rough
6 estimate, 4 times 12, and 2009, so that puts us -- so I
7 mean I estimate at least 100, 150 DWIs by the time I did
8 this one in July of 2009.
9    Q.  Okay. Now, in those investigations, have
10 you -- and I'm not including this case -- have you ever
11 had an experience where you arrested someone based upon
12 their performance on field sobriety tests, and then when
13 you took them down to give them a breath test, they blew
14 zero/zero?
15   A.  Yes.
16   Q.  Other than this?
17   A.  Yes.
18   Q.  Approximately how many times would you say
19 that happened?
20   A.  Between 5 to 10, within -- you're saying from
21 graduation of the academy to date?
22   Q.  Um-hum.
23   A.  Yeah, probably about 5 to 10.
24   Q.  In those 5 to 10, on each and every occasion,
25 did it develop into a DRE investigation?

Page 19

1    A.  I cannot -- I believe yes, but I cannot 100
2 percent answer that one.
3    Q.  Okay. For the cases that did develop into a
4 DRE investigation, you presumably were not doing those
5 investigations yourself?
6    A.  Correct.
7    Q.  Do you know -- in these 5 to 10 -- and I'm
8 just talking about the ones that would have developed
9 into a DRE investigation -- did the DRE investigator ever
10 just, after giving their tests, release the person?
11   A.  Yes.
12   Q.  That did happen?
13   A.  Yes.
14   Q.  Okay. Approximately how many times would you
15 say that happened?
16   A.  Three.
17   Q.  Three times?
18   A.  Yes.
19   Q.  Okay. It sounds like you knew that right off
20 the top of your head.
21   A.  Yes.
22   Q.  Okay. Do you recall the names of those
23 people?
24   A.  I don't recall the names of the people, no.
25   Q.  Okay. Let me ask you this: Have you ever had

Page 20

1 a circumstance similar to this case, where there was a
2 blood draw, so, presumably, the DRE investigator had
3 concerns about whether or not the person was under the
4 influence of drugs, and then the case was -- because it
5 takes several weeks for the blood results to come back,
6 the case was then dismissed after those blood results
7 came back. So as opposed to --
8    A.  Just related to DRE?
9    Q.  Just related to these 5 to 10. So as opposed
10 to people who were just released from the station after
11 their arrest -- I'm not talking about those. I'm talking
12 about people who actually were criminally charged and
13 then the case was later dismissed when the blood results
14 came back negative.
15   A.  Do I know of any that have?
16   Q.  Yes.
17   A.  I do not know of any off the top of my head.
18   Q.  Okay. Now, in your DWI investigations, do you
19 regularly give alternative field sobriety tests?
20   A.  Yes.
21   Q.  So every DWI investigation, you give the
22 alphabet test and the countdown test?
23   A.  Yes.
24   Q.  Now, Officer Burton, I know just from my
25 experience that some police officers, when they make a

Page 21

1 traffic stop, they turn on their belt recorder just to
2 see if there's any kind of difficulty with the person.
3 And then if there isn't any difficulty with the person,
4 they either erase it and record over it with their next
5 traffic stop or not tag it into evidence. Is that
6 something that you have done?
7    A.  No. If I don't tag a tape, it's because I
8 don't -- typically, I always tag tapes for all of my DWI
9 cases. If there's not one, I would have to -- it's an
10 individual basis. I wouldn't know.
11   Q.  Let me ask you, do you always record your
12 investigations?
13   A.  Yes.
14   Q.  So would you have recorded this investigation?
15   A.  Let me clarify. I always attempt to record
16 all the investigations. If I have a malfunction or
17 something takes place like that, there have been
18 situations where I have not recorded an investigation.
19 But by -- whatever you want to use. I can't think of the
20 word -- habit, usually I always record my DWI
21 investigations.
22   Q.  Is that on a belt recorder, or do you have a
23 digital recorder?
24   A.  It's a belt recorder.
25   Q.  Okay. So with regard to this incident that we

Page 22

1  haven't really started talking about specifically, but
2  we'll start now, on July 10th, 2009, involving
3  Mr. Jericho Nagurski, would you have -- do you recall;
4  did you turn on your belt tape?
5    A.  I don't have it mentioned in my remarks. I do
6  not recall off the top of my head why I do not have it
7  listed that I tagged a belt tape.
8        Again, my typical is -- typically, I do tag a
9  belt tape. I do record everything that happens. Why I
10 don't have one for that incident, I couldn't tell you.
11   Q.  If there was a malfunction --
12   A.  I do not document that always, no.
13   Q.  Well, I mean, does it depend on what kind of
14 malfunction there is? I mean if your recorder is broken,
15 do you have to go get a new one?
16   A.  Yes.
17   Q.  So would there be a record of that? Does APD
18 issue you a new one?
19   A.  They do issue me new ones.
20   Q.  Do you recall at all, were you issued a new
21 one after this?
22   A.  I have -- I couldn't tell you when I got my
23 new recorder. I got a new recorder since that date. I
24 don't remember if it was right after that date, so --
25   Q.  Okay. Do you keep spare batteries for your

Page 23

1  recorder?
2    A.  I do.
3    Q.  So if you keep spare batteries, what types of
4  malfunctions with the recorder have you encountered?
5    A.  I've had both -- well, I had malfunctions
6  where the battery is dead and I don't realize it until
7  after the incident is over. I had my tape recorder just
8  go -- however you want to say. They just die. They just
9  don't work.
10   Q.  If they just die, then you go get a new one?
11   A.  Typically, yes.
12   Q.  And when you go and get a new recorder, where
13 do you go? Is there some kind of --
14   A.  Just city property.
15   Q.  City property. Okay. When you go and get a
16 recorder or anything else that you might get from city
17 property, do they have like a little form that you fill
18 out or anything?
19   A.  Yes and no. They do. They do not always
20 require me to fill it out. As long as I'm swapping one
21 for one, I've not always been required to document that I
22 grab a new recorder, as long as I'm, again, swapping one
23 for one, so --
24   Q.  So when you say, "swapping one for one,"
25 you're taking a broken one back?

Page 24

1    A.  Yes. If I give them my broken one, they give
2  me a new one, I've not always had to record -- as long as
3  they have on my property that I have a recorder, that's
4  typically what they care about.
5    Q.  Do you have any idea, since you've been a
6  police officer with APD, how many belt recorders you've
7  gone through?
8    A.  At least five.
9    Q.  Really?
10   A.  Yes.
11   Q.  Let me go ahead and take you to July 10th,
12 2009. Would you explain to me in as much detail as you
13 can -- let me ask you -- I'm sorry. Did have you any
14 dash-cam video in your patrol unit?
15   A.  I do not.
16   Q.  Even a dash-cam that's broken?
17   A.  No.
18   Q.  Okay. Explain to me how it was that you came
19 into contact with Mr. Nagurski on July 10th.
20   A.  On July 10th, at about 12 30 a.m., I was
21 driving eastbound on Lomas. I noted a green Toyota
22 Tacoma. It was in the center lane of a three-lane road
23 on Lomas. It was in front of me.
24        I saw the vehicle was swerving back and forth
25 inside of the center lane. So it's not quite breaking

Page 25

1  the lines, but it's swerving back and forth. During the
2  process of watching the vehicle, I watched it swerve into
3  the left lane and then quickly swerve back into the
4  center lane three times. I also noted the vehicle had no
5  taillights on.
6    Q.  When you say, "swerving," can you give me some
7  more details? For example, how much of the vehicle went
8  into the other lane, if we're dealing maybe tire lengths
9  or the entire width of the vehicle?
10   A.  I don't consider it a swerve unless at least
11 the full tire goes over. Off the top of my head, I want
12 to say the first one was a front tire and then back tire,
13 and then he swerves back in. The second one, he goes
14 about halfway into the next lane and then swerves back
15 over. And the third one I don't remember off the top of
16 my head.
17       Again, it's not considered swerving into the
18 other lane unless the tire makes a full crossover in the
19 barrier, is how I record it.
20   Q.  So upon seeing this traffic violation, what
21 did you do?
22   A.  I initiated my traffic lights and just a quick
23 siren and initiated a traffic stop.
24   Q.  Did Mr. Nagurski pull over appropriately for
25 you?

## Page 26

1  A. Yes.
2  Q. No difficulties with that at all?
3  A. None that I noted.
4  Q. Okay. And after his vehicle stopped and your
5  vehicle stopped, what did you do then?
6  A. I then went and made contact with Nagurski --
7  correct? That's how you pronounce it? I then made
8  contact with Mr. Nagurski. I noted a strong odor of
9  marijuana coming from the vehicle.
10 Q. Let me ask you about that. Was it accompanied
11 with smoke or just an odor of marijuana?
12 A. Odor of marijuana.
13 Q. Okay. And I don't want this to sound like a
14 stupid question, but how do you know what marijuana
15 smells like?
16 A. I've been around marijuana a lot.
17 Q. As a police officer?
18 A. Yes.
19 Q. Okay. So what else did you notice in addition
20 to the odor of marijuana?
21 A. I also noticed that he did have bloodshot,
22 watery eyes. I asked him if he had drank any alcohol or
23 if he had used any type of drugs.
24 Q. Did you smell an odor of alcohol?
25 A. I did not smell an odor of alcohol.

## Page 27

1  Q. Okay. What was his response to you?
2  A. He said that he had not.
3  Q. Okay. Did you specifically ask -- did you
4  explain to him that you smelled an odor of marijuana?
5  A. Yes, I did.
6  Q. And did you have a discussion with him about
7  where the odor could be coming from?
8  A. Yes.
9  Q. Tell me about that discussion.
10 A. We -- I asked him about it. I said that I can
11 smell the strong smell of marijuana in the vehicle. He
12 stated that he did not use any marijuana, but he did
13 mention that at one point somewhere in the evening, he
14 had been around somebody that smoked marijuana. I asked
15 him if he had any marijuana on him. He stated no, that
16 he didn't have any marijuana on him or in the vehicle.
17 Q. Okay. And so was there anything else that you
18 noticed about him that caused you concern at this point
19 during your investigation?
20 A. No.
21 Q. So what did you do?
22 A. I then had him exit the vehicle. He exited
23 the vehicle, and I then had him walk off to the side,
24 where I had him perform the standard field sobriety
25 tests.

## Page 28

1  Q. I'm sorry. I got ahead of myself. Let me
2  back up for a second. Did you have any other
3  conversations with him prior to getting him out of the
4  vehicle? To the best of your recollection, I would like
5  for you to summarize for me everything that you said to
6  him and everything that he said to you, prior to getting
7  him out of the car.
8  A. Just pretty much the things that I've already
9  mentioned, just about the drugs.
10 Q. So where was your testing area for the field
11 sobriety tests?
12 A. It would have been off to the south side. The
13 vehicle is parked to the side of the road, so the south
14 side of the vehicle, on the sidewalk.
15 Q. And what street are we on?
16 A. Lomas.
17 Q. Lomas and --
18 A. I'm going to -- sorry. I'm going to have to
19 glance real quick.
20 Q. Of course.
21 A. I want to say about High Street, I believe, is
22 the name of the street. I can picture it in my head.
23 I'm trying to think of the cross street. Off the top of
24 my head -- I can picture it. I can't think of the street
25 name.

## Page 29

1  Q. Are we talking Lomas -- was he traveling
2  eastbound on Lomas?
3  A. Yes, towards the interstate. It's pretty
4  close to the interstate.
5  Q. Lomas, close to the interstate?
6  A. Yeah.
7  Q. When he pulled over, did he just pull over
8  right there on Lomas?
9  A. Yes.
10 Q. So the field sobriety testing that you're
11 doing is on the sidewalk right there on Lomas?
12 A. Correct.
13 Q. Which of these tests did you give him first?
14 A. The horizontal gaze nystagmus.
15 Q. Okay. And what was your reasoning for giving
16 the horizontal gaze nystagmus, especially since you
17 didn't smell an odor of alcohol?
18 A. I do all the tests the exact same way every
19 time. So I go through my same tests regardless of
20 alcohol, drugs. Regardless of what I think it is, I
21 always do my tests the exact same.
22 Q. Can you tell me, since you've been a police
23 officer, between December '06 and July of 2009,
24 approximately how many arrests you made for impaired
25 driving that you believed were based on drugs and not

PAUL BACA PROFESSIONAL COURT REPORTERS

d07daedb-8241-491a-9ce6-e22e2fc0fc86

Page 30

1 alcohol?
2  A.  I'd say like maybe a fourth.
3  Q.  A fourth? Okay.
4  A.  Possibly less.
5  Q.  So when you make -- well, do you ever call the
6 DRE investigator out to the traffic stop?
7  A.  No, no. Per our policies, we're required to
8 actually go through a full test to see if alcohol is the
9 cause, including have him take the Breathalyzer test,
10 before we can call out a DRE officer.
11  Q.  What policy is that? Is that a standard
12 operating procedure or --
13  A.  I'm not sure if it is listed in our SOP. But
14 every DRE officer I've talked to, that's what they
15 basically asked of us.
16  Q.  So let me understand this. Let me just be
17 clear. If you don't have a reason to believe that a
18 person is driving under the influence of alcohol, and you
19 believe that they may be driving under the influence of
20 drugs, you make an arrest and give them a breath test,
21 even though you don't suspect alcohol?
22  A.  Again, DWI, you're arresting for the
23 impairment. The testing for the alcohol or the drugs is
24 on top of the fact that they are impaired. So regardless
25 of whether he blows zeros on the machine for alcohol, I'm

Page 31

1 still going to pick him up on the impairment that I'm
2 seeing as a driver and then test him for alcohol or drugs
3 in his system.
4  Q.  And you agree with me that you're not trained
5 in detecting drivers who may be impaired by narcotics or
6 drugs other than alcohol?
7  A.  It applies the same -- clarify your question.
8 Let me say that.
9  Q.  You don't have any DRE training?
10  A.  I'm not certified no.
11  Q.  What kind of training do you have in the
12 detection of drivers who are impaired by drugs and not
13 alcohol?
14  A.  The same training -- we receive the same
15 training for both. So our training for DWI is to see
16 impairment to the slightest degree. That's where our
17 training is. So drugs and alcohol, it can be varying,
18 but you're looking for the same type of impairment for
19 both substances.
20  Q.  Okay. Have you ever received any training or
21 any kind of a lecture during the academy or any kind of a
22 suggestion, maybe by a supervisor, anything having to do
23 with people who may be experiencing some physical or
24 medical difficulties that are not due to drugs or
25 alcohol?

Page 32

1  A.  Yes.
2  Q.  You have? Explain that to me.
3  A.  Again, part of our training for DWI is you're
4 looking -- and that goes with some of the questions that
5 we ask prior to running the tests. After they exit the
6 vehicle, I'll go through a series of tests, ask him
7 questions.
8      We are trained to look for other
9 characteristics, ask questions that will -- let me just
10 say -- I'm sorry. We're trained to ask questions. So
11 typically, before I start my test, I'm going to ask, "Do
12 you have any type of medical conditions that would
13 prevent you from performing the tests correctly? Do you
14 have anything that would impair you from being able
15 to" -- I ask it usually like two or three different ways,
16 just to check. I ask same thing.
17      I ask, "Do you wear glasses? Do you wear
18 contacts?" You go through these questions, and then to
19 the best of your abilities, you judge on their reactions
20 after that.
21  Q.  Did you ask Mr. Nagurski these questions?
22  A.  I always ask.
23  Q.  Do you recall what his responses were?
24  A.  He responded that he had no kind of medical
25 condition or disability that would prevent him from

Page 33

1 performing my tests.
2  Q.  Okay. In the sequence of events, when do you
3 ask this question about any kind of medical issue or
4 anything?
5  A.  Before I even start my standard field
6 sobriety -- after I have them exit the vehicle, but prior
7 to me starting the standardized tests.
8  Q.  So you haven't given the instructions on the
9 test?
10  A.  Yeah. Correct.
11  Q.  So can you explain to me how a person is
12 supposed to know whether their particular difficulty
13 would cause a problem on the tests, if you haven't told
14 them what the tests are going to consist of?
15      MR. SHERMAN: Object to form.
16  Q.  Go ahead.
17      MR. SHERMAN: You can answer.
18  A.  Same thing. So I just give them a brief -- so
19 for the horizontal gaze nystagmus, we go through that.
20 For the -- I usually repeat myself before the walk and
21 turn. "Do you have anything that's going to prevent you
22 from being able to walk, turn in a normal fashion?"
23 Usually they answer yes or no to that, too.
24      So I give them a generalized -- again, that's
25 why I say I usually rephrase it two or three different

9 (Pages 30 to 33)

Page 34

1 times, just to ensure that they understand what's going
2 on, that they can walk, they can stand, basically, do
3 something that a person should be able to do in a normal
4 situation.
5  Q. Okay. Well, with regard to the first test
6 that you administer, the horizontal gaze nystagmus, did
7 you see any clues of impairment on that test at all?
8  A. No.
9  Q. Okay. And what was the next test that you
10 gave?
11  A. Walk and turn test.
12  Q. Okay. And tell me exactly what clues you
13 noticed on the walk and turn test.
14  A. I will be referring to this. Missed his heel
15 and toe on Steps 5 and 9, stops on Step 9. On the
16 first -- I'm sorry. On his first set of nine, he stops
17 on Step 9, he turns to me and asked which way he was
18 supposed to turn. Then he does a quick turn to his right
19 and, again, missed his heel to toe on 3, 4 and 7, and
20 does stop again on the correct nine.
21  Q. When you say he missed heel to toe, by how
22 much was his heel not touching his toe?
23  A. His heel/toe ranges from -- I mean off the top
24 of my head, trying to think of him particularly, I won't
25 be able to tell you exact. But usually I don't count it

Page 35

1 unless it's missing, so about half an inch to an inch or
2 further.
3  Q. Okay. Now, you indicated that he turned to
4 the right. And was he instructed to turn to the left?
5  A. Correct. Take small steps to his left.
6  Q. Did he take the small steps?
7  A. No. He did a quick spin.
8  Q. Okay. When you say that he stopped on 9 --
9  A. Step 9. There's nine steps to be taken on the
10 test.
11  Q. So he paused on 9 to ask his question? Is
12 that what happened?
13  A. Correct. He stops the test, asks, "Which way
14 am I supposed to turn?"
15  Q. Okay. And so you're characterizing that as a
16 clue?
17  A. Yes.
18  Q. Okay. Is there anything that indicates that
19 people can't stop and ask a question during the test?
20  A. Once again, part of the instructions was,
21 "Once the test starts, you just continue walking
22 through." So stopping and asking for questions -- again,
23 I advised him, when he asked the question, I said, "Part
24 of the test is remembering the instructions and following
25 through with it." And it took him a while. He stood

Page 36

1 there for a significant amount of time trying to decide
2 which way to turn, and then he did a quick turn.
3  Q. So you didn't answer his question?
4  A. That's part of the test, is remembering what
5 the directions are.
6  Q. Are you trained, if someone asks a question
7 during the test, not to answer it?
8  A. Depending on the question, yes. Yes.
9  Q. Okay. Given that you've done, up to this
10 point, 100 to 150 DWI investigations, looking at these
11 field sobriety tests, relatively speaking, compared to
12 your other investigations, would you say that he did
13 pretty well?
14  A. Clarify. I guess do you mean -- I mean I've
15 had better. I've had worse, so --
16  Q. Where does he fall in that continuum? Does he
17 fall closer to the better end of the continuum or closer
18 to the worse end of the --
19  A. I wouldn't be able to answer that.
20  Q. You can't answer that?
21  A. Off of -- this is -- I've done hundreds of
22 these, and I couldn't tell you. I mean some people do
23 good on certain steps, some people do better on other
24 steps. So about average.
25  Q. Okay. What was the next test that you

Page 37

1 administered?
2  A. One-leg stand.
3  Q. And what clues are you looking for there on
4 the one-leg stand?
5  A. Sways while balancing, puts his foot down,
6 raises his arms, hops, and, again, inability to follow
7 directions.
8  Q. And of those clues, how many clues are you
9 looking for that would cause you concern?
10  A. Two.
11  Q. Okay. And how many clues did you see in this
12 test?
13  A. He raised his arms and wasn't able to follow
14 directions correctly.
15  Q. Of the four standardized clues --
16  A. One.
17  Q. -- you saw one; right?
18  A. Yes.
19  Q. Okay. And when you say that he wasn't able to
20 follow directions, what are you referring to?
21  A. Things like asking me about how long he should
22 be doing this, missing counting, raising feet.
23  Q. What do you mean, "missing counting"?
24  A. He's supposed to count out loud, 1,001, 1,002,
25 1,003, so having gaps in his counting.

Page 38

1  Q. Explain what gaps he had in his counting.
2  A. I believe it was pauses. He's doing pauses.
3  I can't remember the exact number off the top of my head.
4  But I remember he's pausing, thinking -- because he
5  asked, "How long am I supposed to count to?"
6      Again, that's something -- that's part of the
7  thing he's supposed to remember, is that he continues
8  counting until I ask him to stop. So he was asking, "How
9  long am I" -- or, "What number am I supposed to count
10 to?" I just reminded him, "Again, sir, that's part of
11 the test. You have to remember." then he started
12 counting again. So just pauses.
13 Q. Pauses and asking questions during those
14 pauses?
15 A. (Witness nods head.)
16 Q. Is that a yes?
17 A. Yes.
18 Q. Okay. And what was the next field sobriety
19 test that you gave him?
20 A. The alphabet test.
21 Q. Tell me the instructions that you gave him on
22 that test.
23 A. The alphabet test, I explained to him the same
24 standard procedure. "I'm going to have you do the test.
25 I need you to just say your alphabet. You're going to

Page 39

1  start from the letter E and say it all the way to, in
2  this case, the letter Q."
3      So I just explained -- because they usually
4  always ask the question, "I don't know how to say my
5  alphabet backwards."
6      "You're not saying your alphabet backwards.
7  You're just starting at the letter E and ending at the
8  letter Q.
9  Q. Did he say that to you, "I don't know how to
10 say my alphabet backwards"?
11 A. I don't recall. It's just a typical thing.
12 Q. Just tell me the instructions that you would
13 give.
14 A. I say, "I'm going to have you say your
15 alphabet. You start at the letter E. You end at the
16 letter Q. You are not saying this backwards. You just
17 say it forward just like you normally do, A, B, C, D,
18 except you're starting at the letter E and ending at the
19 letter Q."
20 Q. What difficulty did he have with this test, if
21 any?
22 A. He skipped the letter M.
23 Q. M?
24 A. Yes.
25 Q. Okay. What was the next field sobriety test

Page 40

1  that you gave him?
2  A. Countdown test.
3  Q. And what instructions do you give on the
4  countdown test?
5  A. I explained to him, "You're going to count
6  backwards starting from the number 47, ending at the
7  number 22. You're counting backwards just like this, 10,
8  9, 8, 7, all the way until you reach the end. The only
9  difference is you'll be starting at number 47 and you'll
10 be ending at number 22."
11 Q. And did he have any difficulty with that?
12 A. He skipped the number 37 and he stopped at the
13 Number 27.
14 Q. Okay. What did you do after you completed
15 that test?
16 A. At that time I advised him that, due to the
17 results of the tests that I had given him, that he was
18 under arrest for DWI, but that he would be taken to a
19 station where he would have the opportunity to blow into
20 a machine to see what his alcohol content was.
21 Q. Again, at this point in time, did you have any
22 reason to believe that he had been drinking alcohol?
23 A. I didn't know whether it was alcohol or drugs
24 in his system. Again, I treat everything pretty much --
25 until he takes the test and blows, I treat everything the

Page 41

1  same. I believed he was under the influence of
2  marijuana, but what did I -- clarify your question, I
3  guess I should say.
4  Q. I think you answered it. You believed that he
5  was under the influence of marijuana?
6  A. Do I 100 percent? Is that what you're asking?
7  I don't know if it's alcohol or drugs that's affecting
8  his system.
9  Q. Okay. Are you trained to look for issues
10 concerning someone's exit sequence exiting from the
11 vehicle?
12 A. Yes.
13 Q. Okay. I'm a little concerned about the police
14 reports. Can we take the police reports and just have
15 you refer to them if you need to refer to them?
16 A. Sure.
17 Q. Okay. What are some of the things that you're
18 trained to look for with regard to someone's exit
19 sequence?
20 A. Whether they're holding on to the door when
21 they get out, if they need to support themselves, if they
22 sway or lose balance, if they hold on to the vehicle, if
23 they're stumbling around. Basically, anything that looks
24 like they're impaired.
25 Q. Okay. And did you notice anything with regard

Page 42

1  to Mr. Nagurski?
2  A. I do not recall off the top of my head.
3  Q. You can refresh your recollection. I just
4  don't want them sitting in front of you for every single
5  question I ask.
6  A. I don't believe I made any -- I have to look.
7  Yeah. I did make note that he was slow to respond, and
8  he leaned against the vehicle.
9  Q. When you checked off, "slow to respond," tell
10 me exactly what he did that caused you to check off that
11 box.
12 A. Slow response, again, is if I give directions
13 and they give me -- and typically if I write, "slow
14 response," it's because I give a direction and get a
15 blank stare, and it takes them --
16 Q. Do you recall specifically what Mr. Nagurski
17 did?
18 A. Yes, just kind of a slow response. I said,
19 "I'm going to need you to exit the vehicle and step over
20 here." He just kind of stared at me for a while. "Sir,
21 I need you to exit the vehicle and step over here."
22 That's slow response.
23 Q. How many times did you have to say that to
24 him?
25 A. Twice.

Page 43

1  Q. Okay. Any other issue with his exit sequence?
2  A. Just the leaning on the vehicle.
3  Q. At what point did he lean on the vehicle?
4  A. After he stepped out the door, he leaned on to
5  the side of the vehicle. Then I asked him to step away
6  from the vehicle and walk over to where I was standing.
7  Q. So he just sort of randomly stopped? Where
8  were you when he stopped and leaned against the vehicle?
9  A. I'm further down the vehicle.
10 Q. Okay. Had you given him -- you told him to
11 step out of the vehicle; right?
12 A. And walk over with me to the sidewalk.
13 Q. You were not yet over at the sidewalk, were
14 you?
15 A. No.
16 Q. All right. So after you gave him the last
17 field sobriety test, what did you do, placed him under
18 arrest?
19 A. Yes.
20 Q. Okay. And where did you take him?
21 A. He was transported to the Northeast
22 Substation.
23 Q. Okay. Would that be the North Valley
24 Substation?
25 A. I'm sorry. I'm in the Northeast now. The

Page 44

1  North Valley Substation.
2  Q. Okay. What did you do when you got him to the
3  North Valley Substation?
4  A. At the North Valley Substation, during this
5  process, he's given a 20-minute deprivation period where
6  he has no food or drink ingested. And then I read to
7  him -- I always have them stand right next to the --
8  sorry. I've been up for a long time. I have them stand
9  next to and I read -- do you mind if I look at my report
10 real fast to just remind me of the word?
11 Q. Go ahead.
12 A. The Implied Consent Act. I have them stand
13 next to the Implied Consent Act. I said, "I'm going to
14 read you this, and I'm going to have you read along right
15 here so you understand this," in which case I read to him
16 the Implied Consent Act. When he says he understands, I
17 said, "Are you willing to take our test," and he said
18 yes.
19 Q. And he took your test?
20 A. Yes.
21 Q. And you got the results there immediately?
22 A. Yes.
23 Q. And that was a 00?
24 A. Yes.
25 Q. Okay. Up to this point, was Mr. Nagurski

Page 45

1  cooperative with you?
2  A. Yes.
3  Q. Okay. Prior to leaving the scene there on
4  Lomas, did anybody show up?
5  A. Yes.
6  Q. Who showed up?
7  A. His parents.
8  Q. And how did they know to show up there?
9  A. When I -- after I placed handcuffs on him, I
10 advised him his vehicle was going to be towed. He stated
11 that he lived close and his father drove the vehicle to
12 work. His address did come up pretty close to where I
13 was at, and I called his dad to see if he wanted to pick
14 up the vehicle, to be polite.
15      MR. SHERMAN: Do you need to take a break
16 or anything?
17      THE WITNESS: Yeah, if you don't mind.
18      MS. MORRISSEY: Sure, no problem.
19      (A recess was taken.)
20 Q. (By Ms. Morrissey) Let me back up for just
21 one second.
22 A. Sure.
23 Q. On the one-leg stand, of the four standardized
24 clues, you noticed that he raised his arms?
25 A. Um-hum.

| Page 46 | Page 48 |
|---|---|
| 1  Q. Tell me what you saw and why it was concerning | 1  going to go take a breath test. |
| 2  to you. | 2  Q. Did either of the parents tell you that they |
| 3  A. Explain. | 3  didn't smell an odor of marijuana? |
| 4  Q. Did he raise his arms only one time? | 4  A. I don't recall that. |
| 5  A. No. He had his arms raised pretty much for | 5  Q. Okay. And did they go ahead and take the car? |
| 6  the entire time, throughout. | 6  A. Yes. |
| 7  Q. Throughout the entire test? | 7  Q. Did you ever see them again? |
| 8  A. Um-hum. | 8  A. No. |
| 9  Q. Is that a yes? | 9  Q. Did you ever communicate with them again? |
| 10  A. Yes. | 10  A. No. |
| 11  Q. Okay. Have you ever had your deposition taken | 11  Q. So after you gave Mr. Nagurski the breath |
| 12  before? | 12  test, what happened after that? |
| 13  A. Yes, but not in a long time. | 13  A. I contacted Officer Gomez. |
| 14  Q. Just try to give a verbal response so she can | 14  Q. How did you contact him? |
| 15  get it down. | 15  A. I just called him. |
| 16  A. Yes. | 16  Q. On his cell phone? |
| 17  Q. And how much were his arms raised? | 17  A. Yes. |
| 18  A. About a foot, foot and a half away from his | 18  Q. With your cell phone? |
| 19  body. Like about a foot, foot and a half away. | 19  A. Yes. |
| 20  Q. Okay. Now, you indicated that you | 20  Q. What's your cell phone number? |
| 21  contacted -- did you call Mr. Nagurski's father? | 21  A. Yeah, I believe I contacted him on my cell |
| 22  A. Yes. | 22  phone. |
| 23  Q. And did he respond to the scene? | 23  Q. Okay. What's your cell phone number? |
| 24  A. Yes. | 24  A. 301-8549. |
| 25  Q. And was it just him, or was his wife with him? | 25  Q. Do you know what his cell phone number is? |

| Page 47 | Page 49 |
|---|---|
| 1  A. His wife was with him. | 1  A. Not off the top of my head. |
| 2  Q. Okay. And tell me about any contact that you | 2  Q. Do you keep it in your phone? |
| 3  had with them, what you said, what they said. What was | 3  A. Possibly. |
| 4  going on with the parents there? | 4  Q. Could you check and see if you have his cell |
| 5  A. I don't remember the father saying much of | 5  phone number? |
| 6  anything to me. I remember the mother just coming up and | 6      MR. SHERMAN: I just ask that that doesn't |
| 7  saying, pretty much, her son is a good son. He would | 7  get passed on to anybody else. |
| 8  never do this. He doesn't use drugs, pretty much just to | 8      MS. MORRISSEY: Sure. |
| 9  that extent. | 9      MR. SHERMAN: I think Officer Gomez will |
| 10  Q. Did they tell you that he previously had a | 10  be here. You can ask him what his cell phone number is, |
| 11  rollover car accident and had a concussion? | 11  too. |
| 12  A. No. | 12      MS. MORRISSEY: If he can't find it, I |
| 13  Q. They didn't mention that to you? | 13  will. |
| 14  A. No. | 14  A. Yeah. I don't have his number. |
| 15  Q. Did you explain to them that you detected an | 15  Q. (By Ms. Morrissey) Do you remember how you |
| 16  odor of marijuana? | 16  got his number? |
| 17  A. Yes. Yes. | 17  A. He was in my squad. In fact, I don't -- yeah. |
| 18  Q. And was there any discussion about that? | 18  I don't remember. |
| 19  A. Yes. That was the part that I just mentioned, | 19  Q. Was there any particular reason that you |
| 20  that she said, "He doesn't use drugs. He's a good boy. | 20  called Officer Gomez? |
| 21  He'd never do this." | 21  A. Because he's DRE certified. |
| 22  Q. Okay. Anything else you can recall that they | 22  Q. Were there other DRE certified officers in |
| 23  would have said to you? | 23  your squad? |
| 24  A. I just -- she asked where he was going to be | 24  A. No. |
| 25  taken, and I just explained the same process. He was | 25  Q. He's it? |

d07daedb-8241-491a-9ce6-e22e2fc0fc86

1  A.  He was it at the time, yes.
2  Q.  Did you know that he was on duty?
3  A.  Yes. Again, he's in my squad.
4  Q.  When you say he's in your squad --
5  A.  We work together.
6  Q.  Were you on the same shift?
7  A.  Yes.
8  Q.  Okay. So to the best of your knowledge, he
9  was the only DRE certified officer that was available to
10 you?
11 A.  Yes.
12 Q.  Okay. So approximately, if you recall, how
13 long did it take for Officer Gomez to arrive?
14 A.  I don't remember.
15 Q.  No idea at all?
16 A.  No, I don't remember. I don't remember how
17 long it took him. I can check real fast if I wrote it
18 down.
19 Q.  Sure.
20 A.  I did not make note how long it took for him
21 to get there.
22 Q.  Did Officer Gomez just respond to the
23 substation?
24 A.  Yes.
25 Q.  And when he responded, did you have a

1  conversation with him?
2  A.  Yes.
3  Q.  Tell me about that conversation.
4  A.  I just briefly went over pretty much what
5  we've talked about in here, why I stopped him, what I
6  saw, what happened on the tests, what he said to me.
7  Q.  Did you explain to him that you smelled what
8  you believed to be an odor of marijuana?
9  A.  Yes.
10 Q.  Did you ever do -- after you placed
11 Mr. Nagurski in handcuffs there on the scene, did you do
12 an inventory search of his vehicle?
13 A.  Yes.
14 Q.  Did you find anything concerning?
15 A.  No.
16 Q.  No marijuana?
17 A.  No.
18 Q.  So when Officer Gomez responds, do you stay
19 with him during his testing?
20 A.  No.
21 Q.  Okay. Was this the conclusion of your
22 involvement?
23 A.  I transported him after the testing was done.
24 But besides that, I had no other involvement.
25 Q.  Okay. So while Officer Gomez is doing his

1  testing, what are you doing?
2  A.  Paperwork. I'm writing my report.
3  Q.  That's when you wrote your report?
4  A.  Yes.
5  Q.  Okay. Where did you transport him to after
6  Officer Gomez was through?
7  A.  The Juvenile Detention Center.
8  Q.  And you didn't see his parents there at the
9  Detention Center?
10 A.  No.
11     MS. MORRISSEY: Give me just one minute.
12     (A recess was taken.)
13 Q.  (By Ms. Morrissey) Officer, have you ever
14 investigated anyone for DWI who told you that they had a
15 physical disability?
16 A.  Yes.
17 Q.  And how do you handle that, typically?
18 A.  It depends on what the physical disability is,
19 so -- I mean clarify what you mean.
20 Q.  What are some of the physical disabilities
21 that you've encountered?
22 A.  If it's like a leg injury, obviously, I have
23 to kind of adjust my test. I have to judge how much of
24 the test is -- because he has a leg injury -- or he or
25 she has a leg injury, or if it's just intoxication.

1  Again, that's why I give extra tests, is to kind of weed
2  out some of the side things.
3  Q.  Have you ever encountered anyone who you were
4  conducting a DWI investigation on who maybe had sort of a
5  developmental disability, someone who was maybe slightly
6  retarded or --
7  A.  I have not.
8  Q.  You haven't?
9  A.  I have not.
10 Q.  Okay. Of the 5 to 10 people that you arrested
11 that turned out not to be DWI, if you recall, were any of
12 those 5 to 10, people who had disabilities?
13 A.  Yes.
14 Q.  They were?
15 A.  Yes.
16 Q.  And what kinds of disabilities did those folks
17 have?
18 A.  One of them had a serious head trauma, so he
19 had a brain injury. Another one of them was --
20 basically, it was just diagnosed that it was sleep
21 deprivation. And I do not recall -- I just remember
22 those two off the top of my head. I can't recall the
23 other two. But I remember the one that had a brain
24 injury and I remember the sleep deprivation.
25 Q.  These were folks that you actually arrested